13 A.3d 925

BRAYMAN CONSTRUCTION CORPORATION and
Stephen M. MucK, Appellants/Cross–Appellees

v.

COMMONWEALTH of Pennsylvania, DEPARTMENT OF
TRANSPORTATION, Appellee/Cross–Appellants.

Supreme Court of Pennsylvania.

Argued May 12, 2010.

Decided Feb. 22, 2011.

586

James William Kutz, Kandice J. Giurintano, Megan Newcomer Dreisbach, McNees, Wallace & Nurick, LLC, Harrisburg, for Brayman Construction Corporation and Stephen M. Muck.

Jeffrey W. Davis, Jason Michael Wolgemuth, John F. Robinson, Jr., Andrew S. Gordon, Harrisburg, for Department of Transportation.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice SAYLOR.

In this direct appeal, we address whether the Pennsylvania Department of Transportation (PennDOT) may use innovative "best value" and "short listing" methods to solicit and select among bids for highway construction projects.

### I.

In 2008, PennDOT decided to rebuild two bridges, one eastbound and one westbound, carrying Interstate 90 over Six Mile Creek in Erie County (the "Erie County Project"). The existing structures are steel-deck truss bridges, the same general type of construction involved in the fatal bridge collapse in Minneapolis on August 1, 2007. The Erie County bridges were built in 1957 and redecked in 1976. They are each nearly 800 feet long, and their height is 180 feet from the stream bottom to the roadway deck, making them among the highest state-owned bridges in Pennsylvania. Traffic over these bridges consists of 40,000 vehicles daily, a figure that includes some 12,000 trucks. According to PennDOT, the bridges must be rebuilt because their structural integrity has been compromised by cracks, corroding, and other defects. To replace the bridges, PennDOT sought to select a contractor in accordance with procedures outlined in its relatively new internal publication, entitled, "Publication 448, Innovative Bidding Toolkit" ("Publication 448").

Publication 448 describes various innovative bidding methods for selecting contractors for highway projects. It explains that innovative bidding seeks, among other things, to account for social costs, such as disturbance to the traveling public, in addition to taxpayer dollar costs. Publication 448 also recites that there are a variety of methods of innovative bidding, such

as the design-build method, which is a "process by which a single entity bids to provide both the design and construction under a single contract between the Department and the design-build contractor." Publication 448 at 1–3. *See generally* 62 Pa.C.S. § 103 (defining a design/build contract as a "construction contract in which the contractor is responsible for both the design and construction of any public structure or building or other public improvements . . . .").[1]

The design-build method differs from traditional bidding, in which PennDOT designs (or hires an engineering firm to design) the project and then solicits bids for its construction, a process known as design-bid-build procurement. Under design-build, by contrast, PennDOT supplies general technical criteria, and each design-build team formulates a design satisfying those criteria. Thus, the team supplies both design and construction services. *See* Publication 448 at 2–2. Moreover, there are multiple variants of the design-build method, including "design-build best-value" (DBBV). According to Penn-DOT, DBBV provides the agency "with the most potential for multiple design solutions and innovation in the use of materials." *Id.* at 3–1. Its goal is to "reduce overall time from design start to completion of the project, which provides for a shorter project completion time at a lower cost." *Id.* at 2–2.

PennDOT's DBBV procedure includes two steps.[2] The first step is aimed at creating a "short list" of three to five design-

---

1. The entities that compete for design-build projects are known as design-build teams, each consisting of a design professional and a construction contractor prequalified to perform PennDOT work. *See* 67 Pa.Code Ch. 457 (pertaining to the prequalification of bidders). With a design-build project, PennDOT requires all of the initial team submissions—the statements of interest, as discussed below—to be provided by the design professional through the agency's Internet-based engineering construction management system (ECMS). The construction company, however, has no access to the relevant portion of the ECMS, as it is accessible only by qualified design firms. Also, the construction company is not directly notified by PennDOT of the agency's decision regarding the team's submission, as that information is provided through the portion of the ECMS accessible only to the design professionals.

2. There are other DBBV methods described in Publication 448 besides the two-step variant, but they are not directly relevant to this appeal.

build teams, one of which will eventually be awarded the contract. To arrive at this list, PennDOT first publishes advertisements containing, *inter alia*, a general description of the work and its requirements, any additional technical qualifications desired, and the time frame for submitting responses. *See id.* at 2–1. Prospective design-build teams respond by submitting statements of interest detailing their qualifications, the resumes of key personnel, and organizational charts. The statements of interest, however, do not include any monetary bid on the project in question. From the list of timely-submitted statements of interest, PennDOT picks a short list of three to five teams that it considers best suited to the project. It communicates with the short-listed teams to ensure they have a clear understanding of the work involved and that any technical approach they may be considering is responsive to the project's needs. PennDOT additionally debriefs the non-short-listed teams, on request, concerning how they can improve their statements of interest for the next DBBV project. *See id.* at D–20.

The second step in two-step DBBV is for each short-listed team to submit a technical approach and a price, which becomes the basis for a negotiated stipend agreement. To accomplish this, PennDOT enters into a separate stipend agreement with the teams on the short list, under which PennDOT agrees to pay the team a stipend to develop a proposed design for the project. Thereafter, the design partner for each team develops a proposed technical approach and submits it, along with a price bid, to PennDOT. *See id.* at 1–3. The agency utilizes its best-value assessment methodology to determine which proposal supplies the best value for the cost of the bid. The team that submitted the winning proposal is awarded the contract.

## II.

On July 8, 2008, pursuant to Publication 448, PennDOT issued an advertisement seeking statements of interest from teams of engineers and contractors wishing to enter into a DBBV-based contract for the Erie County Project. The

statements were due by July 17, 2008. The advertisement stated that PennDOT would short-list three firms to receive stipend agreements based upon the agency's evaluation of all of the statements it received. The advertisement did not include the scope of the work involved, and it did not indicate that the teams could supply a price bid for the project. Appellant Brayman Construction Corporation, together with the design firm of Drewberry–Goodkind, Inc., submitted a timely statement of interest to PennDOT for consideration. Six other teams also submitted timely statements.

In mid–August 2008, PennDOT short-listed three design-build teams based upon the following weighted criteria as enumerated in its advertisement: experience with similar work (25%); management strategy for design and construction (20%); timely completion and budget control (20%); experience of key personnel (15%); past performance reports (10%); and current workload of the design-build team (10%). The short-listed teams entered into a stipend agreement with PennDOT, and they were invited to submit a technical approach for the project. Brayman–Drewberry was not one of the short-listed teams.

In early September 2008, PennDOT again advertised the Erie County Project on its ECMS system (see supra note 1), and, for the first time, stated that bids for the project's construction costs would be accepted. Bids were due November 13, 2008. Brayman's vice president testified that this second advertisement was akin to the typical notice that PennDOT provides when it seeks competitive bids on a construction job pursuant to its ordinary design-bid-build procedure, as the notice included a description of the scope of the work and a place for the construction contractor to submit a price bid. However, the advertisement also contained a qualifier in its "Special Provisions" section, indicating that bids would only be accepted from the design-build teams that were short-listed by PennDOT, and that all other bids would be rejected.

On November 3, 2008, ten days before bids were due, Brayman Construction, together with its owner and president,

Stephen M. Muck (collectively, "Brayman"), filed in the Commonwealth Court a petition for review in the nature of a complaint in equity (the "Petition"), directed to the court's original jurisdiction. Brayman asserted taxpayer standing, and alleged that PennDOT's actions in using a two-step DBBV process to select a contractor for the Erie County Project was contrary to the Commonwealth Procurement Code (the "Code"),[3] and would compromise the integrity of the competitive bidding process by reducing competition. Brayman contended that the Code sets forth the system of competitive bidding required for all public construction jobs in the Commonwealth, and that it does not authorize PennDOT to use DBBV procurement for such undertakings. Specifically, Brayman averred that Section 512 of the Code, 62 Pa.C.S. § 512, requires competitive sealed bidding except as otherwise provided in Section 511, which in turn refers to Section 513, which does not authorize a "best value" approach. Brayman stated, in this respect, that PennDOT's utilization of that approach results in an over-expenditure of public funds, as compared to the competitive sealed-bid process that the Code directs PennDOT to utilize.[4]

Based on these averments, Brayman sought preliminary and permanent injunctive relief, precluding PennDOT from awarding a construction contract relative to the Erie County Project or future endeavors based upon any form of design-build procurement, including two-step DBBV. Brayman asserted that it had no adequate remedy at law and that the relief it sought represented the only means available to abate the harm caused by PennDOT's conduct. In this regard, Brayman averred that it was precluded from using the administrative appeal process set forth in the Code, *see* 62 Pa.C.S.

3. Act of May 15, 1998, P.L. 358, No. 57 (as amended 62 Pa.C.S. §§ 101–4509).

4. Brayman also maintained that the best-value assessment process violates Article III, Section 22 of the state Constitution, which directs the General Assembly to "maintain by law a system of competitive bidding" for governmental purchases. PA. CONST. art. III, § 22. Brayman alleged that the best-value procedure is unconstitutional because it prevents some qualified entities from submitting a bid.

§ 1711.1, because it was not technically a disappointed bidder. Brayman contended that the statement-of-interest process—as contemplated by Publication 448—essentially constitutes a prequalification procedure to narrow the list of prospective bidders to the short list of design-build teams. Thus, according to Brayman, only the short-listed teams who are not awarded the final contract are entitled to make use of the Code's administrative protest procedures. *See* Petition at 27–28. PennDOT filed a preliminary objection, contending that exclusive jurisdiction over Brayman's claims regarding the agency's procurement procedures is vested in the Secretary of Transportation pursuant to the administrative appeal process, i.e., the bid protest procedure set forth in Section 1711.1 of the Code.[5]

A two-day hearing was held to address the Petition and the preliminary objection, at which Stephen Muck, one other Brayman employee, and various PennDOT employees testified regarding, *inter alia,* two-step DBBV and the bridges in question.[6] At the conclusion of the hearing, the court ruled from the bench, denying PennDOT's preliminary objection and requesting briefing on the merits of Brayman's request for injunctive relief. *See* N.T., Jan. 15, at 207–17. As for the preliminary objection, the Commonwealth Court reasoned that Brayman was not required to use the Code's bid-protest mechanism, available to bidders and prospective bidders, because the short-listing process did not involve any bidding or bid solicitation, but instead amounted to a prequalification process by which PennDOT determined which teams were eligible to submit bids during the second step of the process.

**5.** PennDOT also asserted that Brayman's failure to invoke the administrative appeal process within seven days of the initial advertisement on July 8, 2008, resulted in a waiver of all of its claims. Subsequently, however, the agency clarified that it was only objecting on the grounds that the administrative remedy is exclusive. *See* N.T., Jan. 15, 2009, at 199, 210–12. Similarly, PennDOT observed that it was not challenging Brayman's taxpayer standing as such, but, again, relying solely on the exclusivity of the administrative appeal process. *See, e.g., id.* at 201 (reflecting PennDOT's counsel's statement, "I'll concede that [Brayman] has standing.").

**6.** Details of the hearing testimony are developed below as necessary to resolve the specific issue being addressed.

Since Brayman–Drewberry never advanced to that step, the court did not view Brayman as a bidder or prospective bidder. The court formalized its ruling in an order issued the following day.

After receiving further pleadings and advocacy, the court issued a single-judge, unpublished opinion and order, concluding that DBBV procurement, as implemented by PennDOT, is overly subjective and not authorized by the Code. It thus preliminarily enjoined PennDOT from seeking and evaluating design-build contracts using two-step DBBV "or any other 'innovative method' that does not award the bid based on sealed competitive bids." *Brayman Constr. Corp. v. Penn-DOT*, No. 527 M.D. 2008, *slip op.* at 19 (Pa.Cmwlth., Feb. 17, 2009). In the interest of public safety, however, the court denied relief as to the Erie County bridges, allowing Penn-DOT to continue with the best-value method to award the contract for that project. The court further directed that, if there are other bridges for which proposals have already been sought under the best-value method, PennDOT "may seek an exception to this injunction by showing that the traveling public will be harmed if it is not permitted to proceed." *Id.* at 19–20.

Dissatisfied with the Commonwealth Court's failure to direct PennDOT to re-bid the Erie County Project, Brayman lodged an interlocutory appeal in this Court. PennDOT cross-appealed, challenging the Commonwealth Court's subject matter jurisdiction and asserting, alternatively, that the Commonwealth Court erred in granting a preliminary injunction.[7]

## III.

The first issue that must be addressed is whether the Commonwealth Court properly exercised jurisdiction. PennDOT mainly contends that the Commonwealth Court lacked jurisdiction because Section 1711.1 of the Code applies

7. This Court has jurisdiction to entertain these interlocutory cross-appeals. *See* 42 Pa.C.S. § 5105(c); Pa.R.A.P. 311(a)(4); *Wynnewood Dev., Inc. v. Bank & Trust Co. of Old York Rd.*, 551 Pa. 552, 554, 711 A.2d 1003, 1003 (1998).

to all bidders, prospective bidders, and prospective contractors, *see* 62 Pa.C.S. § 1711.1(a) (quoted below), and Brayman was a prospective bidder or contractor. PennDOT notes, further, that the statutory appeal provision is exclusive, both by its terms, *see id.* § 1711.1(*l* ), and by longstanding precedent requiring that administrative remedies be exhausted. *See Jackson v. Centennial Sch. Dist.*, 509 Pa. 101, 108, 501 A.2d 218, 221 (1985); *Feingold v. Bell of Pa.*, 477 Pa. 1, 6, 383 A.2d 791, 793 (1977). PennDOT also states that Stephen Muck, Brayman's owner, cannot separately maintain a taxpayer lawsuit, when his real interest is having his company win the contract to rebuild the Erie County bridges, thus giving him standing in his own right to invoke the Code's grievance process.[8] Brayman responds by pointing out that PennDOT's first step in procuring the bridges in question was the issuance of the advertisement on July 8, 2008, which only solicited statements of interests, and not bids, offers, or any other binding promise to perform work. Thus, Brayman submits that, under the two-step DBBV procedure that PennDOT used, Brayman never became a prospective bidder or contractor, and it was not aggrieved in connection with the solicitation or award of a contract—both necessary prerequisites to the application of Section 1711.1.

That provision states, in relevant part:

(a) **Right to protest.**—A bidder or offeror, a prospective bidder or offeror or a prospective contractor that is aggrieved in connection with the solicitation or award of a

---

8. PennDOT additionally argues at some length that Brayman lacked taxpayer standing to bring the underlying Petition. *See* Reply Brief for Appellee at 13–15, 21–23. As discussed, however, PennDOT specifically disclaimed any intent to challenge Brayman's standing in its preliminary objections, and affirmatively conceded standing at the hearing. *See supra* note 5; *see also* N.T. Jan. 13, 2009, at 121. Further, although PennDOT nominally included in its answer and new matter an allegation that Brayman lacked taxpayer standing, the substance of its averment did not pertain to standing as such, but only reiterated that Brayman's exclusive remedy was through an administrative bid protest. Thus, to the extent PennDOT now raises a challenge based on the substantive test for whether taxpayer standing exists, the issue is waived. *See* Pa.R.A.P. 302(a). *See generally In re Paulmier*, 594 Pa. 433, 440 n. 1, 937 A.2d 364, 368 n. 1 (2007) (reciting that challenges to standing are waivable).

contract ... may protest to the head of the purchasing agency in writing.

**(b) Filing of protest.**—If the protestant is a bidder or offeror or a prospective contractor, the protest shall be filed with the head of the purchasing agency within seven days after the aggrieved bidder or offeror or prospective contractor knew or should have known of the facts giving rise to the protest except that in no event may a protest be filed later than seven days after the date the contract was awarded. If the protestant is a prospective bidder or offeror, a protest shall be filed with the head of the purchasing agency prior to the bid opening time or the proposal receipt date. If a bidder or offeror, a prospective bidder or offeror or a prospective contractor fails to file a protest or files an untimely protest, the bidder or offeror, the prospective bidder or offeror or the prospective contractor shall be deemed to have waived its right to protest the solicitation or award of the contract in any forum. Untimely filed protests shall be disregarded by the purchasing agency.

\* \* \*

**(*l*) Applicability.**—This section shall be the exclusive procedure for protesting a solicitation or award of a contract by a bidder or offeror a prospective bidder or offeror, or a prospective contractor that is aggrieved in connection with the solicitation or award of a contract. The provisions of 2 Pa.C.S. (relating to administrative law and procedure) shall not apply to this section.

62 Pa.C.S. § 1711.1(a), (b), (*l*).

Our task is to determine whether these procedures applied to Brayman's allegations, where Brayman challenged the legality of PennDOT's best-value procedure generally, as well as the agency's use of two-step DBBV for the Erie County Project, given that Brayman never advanced to the second step. In answering this question, we inquire whether Brayman was a prospective bidder or contractor who was aggrieved in connection with the solicitation or award of a contract, thereby facially coming within the scope of Section

1711.1(a).[9] This is a mixed question of fact and law, as it requires consideration of PennDOT's actions, as well as the significance of terms that appear in Section 1711.1—most notably, "prospective."

The record shows that PennDOT's initial advertisement issued in July 2008 only solicited statements of interest, which consisted of the identity of the firms comprising the design-build teams, their key personnel, present workload, performance histories, and prospective management strategies for the design, construction, and timely completion of the project. The advertisement did not request any technical approach, price bid, or other binding offer to perform work for the agency, and bidding was not accepted at that juncture. No bond or insurance was requested, and there was no defined scope of work or pre-bid meeting, as normally occurs prior to bidding. *See* N.T., Jan. 13, 2009, at 18. This first step was intended by PennDOT to narrow the field of participants to a short list of three, from which technical approaches and price bids would be requested, and the "best value" proposal would be selected. Any short-listed team could elect to enter into a stipend agreement with PennDOT, or withdraw from contention. In light of these factors, the Commonwealth Court concluded that: in the first step of two-step DBBV, "all you have are expressions of interest," N.T., Jan. 15, 2009, at 207; the only firms that are permitted to bid for the work are the three short-listed teams, *see id.* at 211; and, therefore, the first step involves "essentially a high-end prequalification" to bid. *Id.*

The parties differ sharply over whether this means Brayman was a prospective bidder or contractor. Brayman takes a somewhat narrow view of the word "prospective," and highlights that it was eliminated well prior to any solicitation of bids, via PennDOT's action of short-listing the design-build teams. Under this reasoning, Brayman was not a prospective bidder or contractor because, being disqualified, it was not a "potential, likely, or expected" bidder or contractor. RANDOM

---

9. The parties do not contend that Brayman ever became an actual bidder or offeror, or a prospective offeror.

House Webster's College Dictionary 1063 (2d ed. 2000) (defining "prospective" as "potential, likely, or expected").[10] Moreover, no solicitation or award of any contract had occurred at the time Brayman was disqualified, a fact that, under Brayman's view, militates against the conclusion that Brayman was aggrieved "in connection with" the solicitation or award of a contract. *Cf. Common Sense Adoption Servs. v. DPW*, 799 A.2d 225, 233 (Pa.Cmwlth.2002) (holding that a debriefing meeting conducted with non-selected bidders was not "connected with" the solicitation or award of the contract for Section 1711.1 purposes). Thus, if read narrowly, the statutory language excludes Brayman from its scope because Brayman was aggrieved, at the latest, when it was eliminated from contention during the short-listing step of the two-step DBBV procedure, which occurred before any bids were requested or any contract was solicited.

PennDOT, on the other hand, takes a broad view of the term, "prospective," and emphasizes that Brayman wanted to win the contract, or it would not have submitted a statement of interest. *See* N.T. Jan. 13, 2009, at 105. Under this view, Brayman was aware that PennDOT would eventually engage firms in some type of contract bidding relative to the Erie County bridges, and that Brayman, as a prequalified PennDOT contractor, would benefit financially if it ultimately won the contract. In this broader sense, Brayman was a prospective (in the sense of "potential") bidder or contractor until the selection of the short list, and was aggrieved in connection with the solicitation of a contract, either because the contract was solicited from a group of design-build teams from which Brayman was excluded, or because the solicitation began when

10. Neither the Code nor the Statutory Construction Act defines "prospective," and the parties do not contend that the word has acquired a "peculiar and appropriate meaning." 1 Pa.C.S. § 1903. Therefore, we must treat it according to its common and approved usage. *See id.; Huntley & Huntley, Inc. v. Borough Council of Oakmont*, 600 Pa. 207, 222 & n. 9, 964 A.2d 855, 864 & n. 9 (2009). PennDOT points out that prospective can also mean, essentially, "effective in the future" (as contrasted with retrospective or retroactive). *See* Reply Brief for Appellee at 8 n.5. However, this meaning does not appear to have any significance for the present controversy.

PennDOT published its initial advertisement. Since Brayman's underlying complaint challenges the legality of two-step DBBV generally, moreover, Brayman knew of the facts giving rise to the protest on or about July 8, 2008, because, as of that date, Brayman became aware that PennDOT might exclude it from the short list—and, hence, might refuse to consider its bid—contrary to what Brayman believed the law required.

In the broadest sense, almost any company can be considered a "potential" bidder or contractor because almost any company can, under the right conditions, eventually become qualified to bid on PennDOT projects and be awarded contracts. However, the Legislature clearly did not intend all such persons to be swept into the categories of prospective bidder or prospective contractor. The issue for resolution involves where the Legislature intended the line to be drawn. We need not formulate an answer to that question general enough to apply in all cases—which, in any event, may be impossible to do at this juncture. We conclude, however, that where (as here) PennDOT implements a procedure that entails some form of competitive bidding on a construction project, and additionally divides the group of hopeful bidders into a subset of companies from which it is willing to consider bids, and another subset from which it is not willing to consider bids, the members of the latter group never become "prospective" bidders or contractors in more than a highly attenuated sense. Although they may hope to bid or win the contract at the beginning of the process, there is never an identifiable point in time during that procedure when it is possible for them to bid. Under these circumstances, the complaining entity's potential for bidding or contracting with the agency is highly attenuated and, in our view, insufficient to allow it to come within the meaning of the "prospective" qualifier as used in the statute. *Cf. Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed.Cir.2006) (holding that, to be considered a "prospective bidder" under the Tucker Act, the party in question must establish that it had a "substantial chance" of receiving the contract); *MCI Telecomms. v. United States*, 878 F.2d 362, 365 (Fed.Cir.1989) ("The language of [the rele-

vant statute] plainly establishes, by use of the word 'prospective,' that, in order to be eligible to protest, one who has not actually submitted an offer must be *expecting* to submit an offer prior to the closing date of the solicitation." (emphasis in original)).

As applied here, PennDOT engaged in a form of competitive bidding, but there was never a time when it allowed Brayman or the Brayman–Drewberry team to forward a bid. PennDOT did not accept bids in response to its initial advertisement. Then, after the statements of interest were received, it clarified in its second announcement that bids would be accepted, but only from the short-listed teams, of which Brayman–Drewberry was not one. Brayman–Drewberry was thus excluded from bidding before any bids were solicited and, hence, never had any affirmative expectation of being able to bid. In short, although Brayman–Drewberry had hoped to be able to submit a bid to design and build the bridges (and have that bid considered on a competitive basis with other bids), it was precluded from doing so via the portion of the process that the Commonwealth Court analogized to a "high-end prequalification" step.

■ We conclude, then, that Brayman was neither a prospective bidder nor a prospective contractor for purposes of the statutory protest mechanism.[11] That being the case, PennDOT cannot prevail on its argument that the Commonwealth Court erred in exercising its equity jurisdiction in light of the Code's exclusive statutory remedy set forth in Section 1711.1.[12]

11. In light of this holding, we need not inquire whether Brayman was aggrieved "in connection with" the solicitation or award of a contract.

12. The parties argue this point primarily in terms of whether the Commonwealth Court had jurisdiction. However, the rule requiring exhaustion of available administrative remedies pertains, not to the existence of subject matter jurisdiction, but to whether such jurisdiction is properly exercised. *See Beattie v. Allegheny County,* 589 Pa. 113, 124 n. 5, 907 A.2d 519, 526 n. 5 (2006). Moreover, PennDOT has not asserted that the Commonwealth Court should have refrained from exercising its jurisdiction pursuant to a residual exhaustion requirement independent of Section 1711.1. That particular issue is therefore not before us. *See generally Shenango Valley Osteopathic Hosp. v. Dep't*

A similar result obtains in relation to Brayman's general challenge to the legality of two-step DBBV. Brayman listed, as one of the actions sought to be enjoined, PennDOT's utilization of DBBV procurement for future projects in accordance with Publication 448. *See* Petition at 3. Since Brayman did not correlate this request with any conduct of the agency on a particular project, no solicitation or award of a contract exists that can potentially form the basis for triggering Section 1711.1's remedies. Still, PennDOT objects that Brayman's actions represent an inappropriate effort to circumvent Section 1711.1's exclusivity, arguing that "Brayman cannot bypass the administrative remedy simply by stating its argument in abstract, hypothetical terms[.]" Reply Brief for Appellee at 18. As we have concluded that Brayman's allegations do not implicate Section 1711.1, PennDOT's premise in this regard is faulty.

## IV.

 We turn now to the substantive challenges to the Commonwealth Court's order. To obtain a preliminary injunction, a petitioner must establish that: (1) relief is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by money damages; (2) greater injury will occur from refusing to grant the injunction than from granting it; (3) the injunction will restore the parties to their status quo as it existed before the alleged wrongful conduct; (4) the petitioner is likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending activity; and (6) the public interest will not be harmed if the injunction is granted. *See Summit Towne Ctr., Inc. v. Shoe Show of Rocky Mount, Inc.*, 573 Pa. 637, 646–47, 828 A.2d 995, 1001 (2003). Appellate courts review a trial court order refusing or granting a preliminary injunction for an abuse of discretion. *See id.* at 645, 828 A.2d at 1000. This standard is applied as follows:

*of Health*, 499 Pa. 39, 46 n. 7, 451 A.2d 434, 437 n. 7 (1982) (noting that the general principle requiring exhaustion of administrative remedies is a "judge-made rule").

[O]n an appeal from the grant or denial of a preliminary injunction, we do not inquire into the merits of the controversy, but only examine the record to determine if there were any apparently reasonable grounds for the action of the court below. Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the Chancellor.

*Roberts v. Bd. of Dirs. of Sch. Dist. of Scranton,* 462 Pa. 464, 469, 341 A.2d 475, 478 (1975), *quoted in Summit Towne Ctr.,* 573 Pa. at 645–46, 828 A.2d at 1000.

The Commonwealth Court's order states, in full:

PennDot is enjoined from seeking and evaluating design build contracts using the best-value method or any other "innovative method" that does not award the bid based on sealed competitive bids.

PennDot is permitted to use the best-value method to award the contract for the construction of the bridges at issue here. If there are other bridges where proposals were sought under the best-value method, PennDot may seek an exception to this injunction by showing that the traveling public will be harmed if it is not permitted to proceed.

*Brayman,* No. 527 M.D. 2008, *slip op.* at 19–20. Because the appellate standard recited above pertains to a chancellor's order "refusing or granting" a preliminary injunction, we must apply it in evaluating both of the Commonwealth Court's actions: its grant of preliminary injunctive relief in the first paragraph, and its denial of similar relief as to the Erie County Project in the second paragraph.[13]

■ PennDOT initially asserts that the Commonwealth Court erred in granting a preliminary injunction because the *Procurement Code* authorizes it to use, not only competitive sealed bidding under Section 512, but competitive sealed proposals under Section 513. *See* 62 Pa.C.S. §§ 512, 513. The

13. Although the court's order also denies relief as to "other bridges" where proposals were sought under the best value method and Penn-DOT can show that the public will be harmed if it cannot proceed, Brayman has not appealed that part of the order.

agency submits that this Court recently held that the Department of General Services may award contracts under this latter provision, and that there is no reason why PennDOT may not do so as well. *See* Brief for Appellee at 29–30 (citing *Pa. Associated Builders & Contractors, Inc. v. DGS*, 593 Pa. 580, 596, 932 A.2d 1271, 1281 (2007) (plurality)); Reply Brief for Appellee at 23. PennDOT also posits that no legal issue exists pertaining to Sections 512 and 513 in any event, because the salient interpretive question, for present purposes, concerns

whether PennDOT may first short-list the design-build teams that are interested in bidding on the project through the process called for by § 905 of the Procurement Code, 62 Pa.C.S. § 905 (relating to procurement of design professional services), before soliciting competitive sealed bids from the short-listed design-build teams and awarding the contract based on the competitive sealed bids.

Brief for Appellee at 29.

Regarding PennDOT's first contention—that it should not be barred from procuring construction contracts using the steps prescribed by Section 513—we note that the controversy presented to, and addressed by, the Commonwealth Court did not relate to that provision, but to PennDOT's use of innovative bidding pursuant to Publication 448. There was no discussion about procurement through methodologies independent of the "innovative" approaches utilized by the agency and, as Brayman points out, PennDOT never indicated, during the course of the proceedings, that it has sought contracts under Section 513 or intends to do so in the future. *See* Reply Brief for Appellants at 45. Thus, while it is understandable that PennDOT would be concerned that the first paragraph of the injunction could be understood to proscribe its utilization of Section 513 as a general proposition, and that such a proscription might be in tension with the thrust of the plurality opinion in *Pennsylvania Associated Builders*, we find the Commonwealth Court did not intend that meaning. Our conclusion in this regard is supported by the text of the injunction which, upon close examination, only prohibits the

agency from utilizing "any ... '*innovative method*' that does not award the bid based on sealed competitive bids" (emphasis added). As such, it does not speak to whether Section 513's sealed-competitive-proposal procedure is removed from Penn-DOT's purview in other instances.

PennDOT's second argument, that the permissibility of the short-listing methodology described in Publication 448 is at the heart of the substantive legal dispute in this appeal, has more resonance. Although the injunction facially prohibits the agency from seeking and evaluating "design build contracts" using "the best-value method"—in other words, from employing DBBV procurement—that prohibition must be read against the Commonwealth Court's explanation of what it understood DBBV to be. Based upon the evidence presented at the preliminary injunction hearing, the Commonwealth Court stated that

> what Best Value appears to be is the "Two Step Selection method" mentioned in Publication 448 by which the number of bidders is short-listed and then stipends given to prepare their final bids.

*Brayman*, No. 527 M.D. 2008, *slip op.* at 13. While the opinion refers to portions of the Code that require competitive sealed bidding, *see* 62 Pa.C.S. § 512 (as opposed to competitive sealed proposals, *see id.* § 513), as well as the general directive that contracts be awarded to the lowest responsible bidder, *see, e.g., Brayman*, No. 527 M.D. 2008, *slip op.* at 14, 16 & n. 10 (citing 62 Pa.C.S. § 512(g)), it ultimately clarifies, consistent with the passage quoted above, that

> [t]he "Best–Value" system violates the Procurement Code because in seeking bids for "construction contracts," Penn-Dot is not allowed to short-list bidders or evaluate bids based on factors not enunciated in the invitation for bids.

*Id.* at 17; *see also id.* at 19 (again expressing that no "intermediate step of short-listing of bidders" is authorized by the Code). Given the above, PennDOT's assertion—that the Commonwealth Court was focused on the permissibility of short-listing—is correct as far as it goes.

It does, however, overlook another issue that arose in the proceedings and that figured prominently in the Commonwealth Court's analysis. The court was of the view that the "best value" methodology, as applied by PennDOT pursuant to Publication 448, violates the Code due to its subjectivity. This aspect of the challenged procurement method was in sharp focus during the proceedings, and the court ultimately emphasized its concern over the lack of a clear definition or explanation of the best-value process. *See id.* at 10–12 n. 9; *see also id.* at 13. Indeed, much of the questioning by the court and counsel pertained to whether there were any objective standards that PennDOT could employ pursuant to Publication 448. The agency's employees, however, were unable to give a clear description of how its best-value analysis works. To the contrary, they ultimately: agreed with the court that the best-value selection method is "kind of nebulous," N.T., Jan. 13, 2009, at 75; conceded that the process includes "some subjectivity," *id.* at 80; and indicated that it entails a qualitative assessment based on whether PennDOT believes the particular personnel assigned to the project within the design-build teams are good performers. *See* N.T., Jan. 15, 2009, at 192; *see also* N.T., Jan. 13, 2009, at 86 (reflecting the testimony of the director of PennDOT's Bureau of Construction and Materials that having a common, objective standard by which to measure bids is important to the procurement process). We need not opine concerning whether best value, as thus described, constitutes good or bad policy. Rather, our point here is that the first paragraph of the injunction was evidently aimed, among other things, at preventing PennDOT from employing a Publication 448–based best value analysis when assessing design-build teams during any aspect of the procurement process. In summary, then, the injunction prohibits PennDOT from (a) short-listing design-build teams, or (b) using a Publication 448 best-value assessment method during procurement.

Having clarified the meaning of the injunction, we now address PennDOT's assertion that it should not have issued. PennDOT's argument appears to be two-fold: first, that it is

authorized to award construction contracts by "competitive sealed proposals" under Section 513 of the Code, *see* 62 Pa.C.S. § 513, and second, that the Commonwealth Court should not have held that it is prohibited from short-listing the design-build teams, in view of Section 905 of the Code, which sets forth special procedures for an agency to enter into a contract for "design professional services." *See id.* § 905. As to the first of these grounds, we have explained that the injunction does not address PennDOT's ability to proceed under Section 513 so long as Publication 448's best-value methodology is not employed.[14] The only remaining allegation, then, is that the Commonwealth Court erred in precluding PennDOT's short-listing of design-build teams using two-step DBBV, a practice PennDOT suggests is authorized, at least for design services, by Section 905. Since that is really the crux of the issue concerning whether the preliminary injunction should be upheld, a more detailed review of the Commonwealth Court's reasoning and PennDOT's response is warranted.

Initially, we note, as did the Commonwealth Court, that the general rule for procurement under the Code is that, "[u]nless otherwise authorized by law, all Commonwealth agency contracts shall be awarded by competitive sealed bidding under section 512[.]" 62 Pa.C.S. § 511.[15] Section 511 lists several

14. PennDOT does not dispute, in general terms, the Commonwealth Court's directive that, due to a lack of objective standards, its Publication 448–based best-value methodology may not be utilized during procurement. Indeed, the court's evaluation was expressed against a backdrop of case law explaining that competitive bidding rules exist, not only to secure work and supplies at the lowest possible price, but to guard against favoritism in the awarding of contracts. *See Brayman*, No. 527 M.D. 2008, *slip op.* at 9 n.7 (quoting *Yohe v. City of Lower Burrell*, 418 Pa. 23, 28, 208 A.2d 847, 850 (1965)); *see also Louchheim v. City of Phila.*, 218 Pa. 100, 103, 66 A. 1121, 1122 (1907). Accordingly, to the extent any question remains as to the propriety of this part of the order, we find that it is supported by the hearing testimony concerning the lack of objective standards in best-value assessment, and the consequent potential for subjective factors to play a substantial role in the awarding of contracts.

15. Section 512 provides, in relevant part:

exceptions to this general rule. Among other things, these exceptions authorize a procuring agency to use the procedures outlined in Section 905 (relating to procurement of design professional services). *See generally* 62 Pa.C.S. § 511 (listing exceptions to the general rule). In view of these provisions, the Commonwealth Court reasoned, first, that the Code's "default position" is that contracts must be awarded by sealed competitive bids under Section 512, unless there is a specific exception that allows a different method. *Brayman,* No. 527 M.D. 2008, *slip op.* at 14 (citing 62 Pa.C.S. § 511). The court acknowledged PennDOT's assertion that DBBV falls under one of the exceptions listed in Section 511, namely, Section 905, which PennDOT construed as permitting design professional services to be awarded through a two-step procurement methodology. Even assuming PennDOT's interpretation of Section 905 was correct, the court indicated that, in DBBV procurement, PennDOT seeks, not the procurement of design services, but a "design-build contract, which by definition is a 'construction contract.'" *Id.* at 17 (quoting 62 Pa.C.S. § 103). Thus, the court concluded that the DBBV system violates the Code because, in seeking bids for construction contracts, PennDOT is not authorized to short-list bidders or evaluate bids based on factors not enunciated in the invitation for bids. *See id.* at 17; 62 Pa.C.S. § 512(e) (*quoted in supra* note 15).

Responding to the above, PennDOT focuses much of its advocacy on contending that the court improperly issued a

(a) **Conditions for use.**—Contracts shall be awarded by competitive sealed bidding except as otherwise provided in section 511 (relating to methods of source selection).

(b) **Invitation for bids.**—An invitation for bids shall be issued and shall include a procurement description and all contractual terms, whenever practical, and conditions applicable to the procurement.

\* \* \*

(e) **Bid acceptance and evaluation.**—... Bids shall be evaluated based on the requirements set forth in the invitation for bids.... No criteria may be used in bid evaluation that are not set forth in the invitation for bids.

\* \* \*

(g) **Award.**—The contract shall be awarded within 60 days of the bid opening by written notice to the lowest responsible bidder or all bids shall be rejected except as otherwise provided in this section....

62 Pa.C.S. § 512(a), (b), (e), (g).

final decree "purporting to conclude the controversy between the parties concerning the legality of DBBV procurement" solely on the basis of a preliminary injunction hearing. Brief for Appellee at 33. PennDOT suggests that this alleged impropriety constitutes grounds for reversal because a preliminary injunction hearing may not be converted into a final hearing on the merits, except upon stipulation of the parties. *See id.* at 32 (citing *Santoro v. Morse,* 781 A.2d 1220, 1229 (Pa.Super.2001) (*en banc* )); *see also* Reply Brief for Appellee at 24. Although this latter point is well established, *see Sch. Dist. of Pittsburgh v. Pittsburgh Fed'n of Teachers,* 486 Pa. 365, 373, 406 A.2d 324, 328 (1979), we do not draw the same conclusion from it as PennDOT does, for the following reasons.

The Commonwealth Court had to assess whether Brayman was likely to prevail on the merits in order to determine whether a decree should issue preliminarily enjoining Penn-DOT from utilizing the challenged procurement methods. *See Summit Towne Ctr.,* 573 Pa. at 647, 828 A.2d at 1001. This necessitated an evaluation of whether the Code authorized the use of that method, which, in turn, required the court to review the relevant statutory provisions in an attempt to discern the scope of the powers held by procuring agencies. *See Brayman,* No. 527 M.D. 2008, *slip op.* at 13 (characterizing the "central issue" as "whether PennDot is authorized under the Procurement Code to utilize the 'Best–Value' process to award contracts...."). *See generally Small v. Horn,* 554 Pa. 600, 609, 722 A.2d 664, 669 (1998) (observing that state administrative agencies are creatures of the Legislature and may only exercise those powers that are conferred upon them by statute). The court could not have performed that task without applying the relevant statutory provisions, based upon a proper understanding of their meaning, to the facts as developed at the hearing.

We acknowledge that there is an arguable tension between this need to construe the statute as a means of determining a likelihood of prevailing on the merits, and the preliminary nature of the hearing. However, this Court has previously endorsed a trial court's actions in construing legislative enact-

ments where doing so is necessary to determine whether a preliminary injunction is warranted, *see Verardi v. Borough of Sharpsburg*, 407 Pa. 246, 249, 180 A.2d 6, 8 (1962); *cf. Success Against All Odds v. DPW*, 700 A.2d 1340, 1350 (Pa. Cmwlth.1997) ("[A]t this stage of the proceedings, addressing a demurrer, a definitive legal ruling on the interpretation of the statutory language is now required . . . ."), and we see nothing improper in the Commonwealth Court's approach here. Moreover, it is presently unknown whether that court will carry its reasoning from its preliminary disposition over into a final decree, particularly as further factual development may occur which could potentially cast PennDOT's procurement methodologies in a different light. Unlike PennDOT, then, we do not view the court's efforts to ascertain whether the Code authorized the challenged procurement methodology as constituting reversible error solely due to the preliminary nature of the hearing.

■ Although, as noted, PennDOT's primary assertion is that the Commonwealth Court improperly rendered a final ruling on the merits, PennDOT does briefly suggest, as a secondary matter, that it may employ the enjoined two-step method under a hybrid of Sections 905 and 512, with Section 905 forming the basis for short-listing, and Section 512 constituting the foundation for selecting the among the sealed bids. *See* Brief for Appellee at 23–24; *id.* at 29 ("The issue is whether PennDOT may first short-list the design-build teams that are interested in bidding on the project through the process called for by § 905 of the Procurement Code, 62 Pa.C.S. § 905 (relating to procurement of design professional services), before soliciting competitive sealed bids from the short-listed design-build teams and awarding the contract based on the competitive sealed bids."). Even if we assume that Section 905 allows DBBV–type short-listing of design firms when obtaining design professional services, the Commonwealth Court determined that design-build agreements do not qualify as contracts for design professional services because the Code defines them as a type of construction contract, *see* 62 Pa.C.S. § 103, and PennDOT does not attempt to

cast doubt upon that determination. In fact, PennDOT has not supplied this Court with any developed advocacy concerning the substance of the Commonwealth Court's legal analysis, thereby waiving any challenge to that analysis for purposes of the present appeal. Accordingly, we find no basis to question it at this juncture.[16]

## V.

■■■ Having credited the Commonwealth Court's partial grant of injunctive relief, it remains to address Brayman's claim that the court erred in denying relief concerning the Erie County Project. The Commonwealth Court explained its decision in a single sentence, stating that "the bridges at issue here are in need of immediate replacement and the public will be harmed if the contracting process is delayed by one year to 18 months if [PennDOT] has to start all over in seeking bids." *Brayman*, No. 527 M.D. 2008, *slip op.* at 19. Brayman disagrees with this assessment, arguing that the bridges were not in immediate danger of collapsing—because if they were, PennDOT would have closed them to traffic—and that no reasonable basis existed for the court to conclude that there would be a twelve-to-eighteen-month delay if the injunction issued. Brayman maintains, instead, that the record suggests there would have been no delay, and PennDOT had numerous other ways to procure the project through legal means. Penn-DOT responds that the hearing testimony supported several factual predicates that could have given the Commonwealth Court reasonable grounds to conclude that the public would be harmed by any delay in reconstructing the bridges. Most notably, PennDOT argues that that the bridges' design is

16. That being the case, we also need not analyze whether any state constitutional provisions have been violated (*see supra* note 4).

As a separate matter, PennDOT contends that the injunction should be overturned because it does not preserve the status quo between the parties. PennDOT defines the status quo as Brayman's "acceptance and active participation" in two-step DBBV procurement. Brief for Appellee at 34. By the time Brayman filed its petition, however, it no longer accepted the legitimacy of two-step DBBV. Thus, PennDOT's argument is based on an erroneous factual premise.

"fracture critical," and that they are more than 50 years old and in a deteriorated condition. Brief for Appellee at 20.

 "The proponent of a preliminary injunction faces a heavy burden of persuasion especially where, as here, the trial court has not been persuaded and has denied the injunction request. The proponent must also overcome the narrow scope of appellate review which will uphold that denial if there [were] 'any apparently reasonable grounds.'" *Allegheny County v. Commonwealth*, 518 Pa. 556, 562, 544 A.2d 1305, 1308 (1988) (quoting *Singzon v. DPW*, 496 Pa. 8, 12, 436 A.2d 125, 127 (1981)). Here, the Commonwealth Court, in effect, only provided analysis regarding the final prong of the standard for granting a preliminary injunction—the no-harm-to-the-public-interest requirement—and determined that that prerequisite was not satisfied. Thus, we will first evaluate whether the court had a sufficient basis for such determination because, if so, our inquiry will be at an end.

Upon careful review of the record, we believe that the Commonwealth Court had, at a minimum, apparently reasonable grounds to find that the traveling public could suffer harm if PennDOT were required to start over in its procurement process for the Erie County Project. The crucial evidence was provided by Brian Thompson, the director of Penn-DOT's Bureau of Design.[17] His testimony indicated that, since 2006, the superstructure rating for the bridges has been at three out of nine, meaning that they had been in poor condition for at least three years. Mr. Thompson also noted the presence of substantial structural deficiencies, corroding, and a weakening in "fatigue resistance" due to the bridges' age. In fact, he indicated that the bridges were in the 26th worst condition out of Pennsylvania's 25,000 state-owned bridges. Finally, Mr. Thompson suggested that a completion delay of twelve-to-twenty-four months could ensue if the in-

---

17. Brayman suggests that this Court disregard Mr. Thompson's testimony because his credibility was suspect. *See* Brief for Appellant at 27. Evidently, the Commonwealth Court thought otherwise, and it is not an appellate court's function to reweigh the testimony or second-guess the trial court's credibility determinations. *See Summit Towne Ctr.*, 573 Pa. at 652–53, 828 A.2d at 1004–05.

junction were granted. *See* N.T., Jan. 15, 2009, at 127–39, 159–61. In consideration of this testimony, and particularly as these bridges carry 40,000 vehicles per day over the relevant part of Interstate 90, we conclude that adequate grounds exist in the record to support the Commonwealth Court's decree. *See Roberts,* 462 Pa. at 469, 341 A.2d at 478 ("Only if it is plain that no grounds exist to support the decree ... will we interfere with the decision of the Chancellor.").[18]

## VI.

For the reasons stated, the order of the Commonwealth Court is affirmed, and the case is remanded to that court for further proceedings.

Chief Justice CASTILLE, Justices EAKIN, BAER, TODD, McCAFFERY and ORIE MELVIN join the opinion.

18. Brayman also proffers that, because the court found PennDOT's procurement method to be illegal, its decision to permit the Erie County Project to proceed to completion under two-step DBBV amounted to allowing PennDOT to spend public funds pursuant to an illegal contract, resulting in *per se* irreparable harm. *See* Brief for Appellants at 23 (quoting *Shaeffer v. City of Lancaster,* 754 A.2d 719, 723 (Pa.Cmwlth. 2000)). This argument pertains to the irreparable-harm prong of the standard for granting a preliminary injunction. As all six prerequisites must be satisfied for an injunction to issue, and as we have found that the no-public-harm requirement has not been met, we need not address Brayman's argument in this regard.