**Mark HANISCO, Appellant**

v.

**TOWNSHIP OF WARMINSTER and Solid Waste Services, Inc. d/b/a J.P. Mascaro & Sons.**

Commonwealth Court of Pennsylvania.

Argued Oct. 19, 2011.

Decided Jan. 5, 2012.

Reconsideration Denied March 6, 2012.

Dorothy A. Hickok, Philadelphia, for appellant.

Michael J. Savona, Jenkintown, for appellee Township of Warminster.

Albert A. DeGennaro, Audubon, for appellee J.P. Mascaro & Sons.

BEFORE: LEADBETTER, President Judge, and PELLEGRINI, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BROBSON, Judge, and BUTLER, Judge.[1]

OPINION BY Judge COHN JUBELIRER.

Mark Hanisco (Hanisco) appeals the January 11, 2010 Order of the Court of Common Pleas of Bucks County (trial court) denying his Petition for Preliminary and Permanent Injunctive Relief (Petition) and dismissing his Amended Complaint. Hanisco sought to invalidate a two-year extension of a waste services contract between the Township of Warminster (Township) and Solid Waste Services, Inc. d/b/a J.P. Mascaro & Sons (Mascaro) on the grounds that the parties renegotiated the price for the extension thereby triggering the application of the public, competitive bidding requirements of Section 3102(a) of the Pennsylvania Second Class Township Code[2] (Code), 53 P.S. § 68102(a).

The parties stipulated to the facts. (Joint Stipulation of Facts and Evidence (Stipulation), R.R. at 189a–202a.) In the fall of 2004, the Township sought bids from private waste haulers to provide waste pickup and disposal services within the Township. (Stipulation at ¶ 1, R.R. at 189a.) The Township's Notice to Bidders stated that the proposed waste services contract, to begin on January 1, 2005, should be presented as: (1) a three-year contract with an option for two one-year extensions; or (2) a five-year contract with an option for two one-year extensions. (Stipulation at ¶ 2, R.R. 190a.)

The Township awarded the contract to Mascaro as the lowest responsible bidder and the only bidder (2005 Contract). (Stipulation at ¶¶ 5, 6, R.R. at 190a.) The Township selected the five-year alternative with the option exercisable by the Township for two one-year extensions. (Stipulation at ¶ 6, R.R. at 190a.) Accordingly, the 2005 Contract would end on December 31, 2009, unless extended by the Township through the exercise of its options. (Stipulation at ¶ 11, R.R. at 191a.) In its final form, the 2005 Contract prices for each year were as follows:

---

1. This case was decided before Judge Butler's term ended on January 2, 2012.

2. Act of May 1, 1933, P.L. 103, added by Section 1 of the Act of November 9, 1995, P.L. 350, *as amended*.

| Year | Total Amount | Unit[3] Price Per Month | [Unit Price Per Year] |
|------|--------------|-------------------------|------------------------|
| 2005 | $ 2,191,224.00 | $21.90 | [$262.80] |
| 2006 | $ 2,736,000.00 | $27.34 | [$328.08] |
| 2007 | $ 3,286,000.00 | $32.84 | [$394.08] |
| 2008 | $ 3,476,992.00 | $34.75 | [$417.00] |
| 2009 | $ 3,680,008.00 | $36.78 | [$441.36] |
| Total | $15,370,224.00 | | |

*Options:*

| Year | Total Amount | [Unit Price Per Month] | Unit Price Per Year |
|------|--------------|------------------------|---------------------|
| 2010 | $3,977,940.00 | [$39.76] | $477.09 |
| 2011 | $3,977,940.00 | [$39.76] | $477.09 |

(Stipulation at ¶ 10, R.R. at 191a.)

The parties executed the 2005 Contract on March 24, 2005. (Stipulation at ¶ 8, R.R. at 191a.) In the fall of 2009, with the end of the five-year contract term approaching, the Township began to study the question of whether to exercise the options in the 2005 Contract, or advertise for a new contract. (Stipulation at ¶ 12, R.R. at 192a.) Mascaro and the Township held a telephone conference call on September 18, 2009 and scheduled a meeting for September 25, 2009. (Stipulation at ¶¶ 13–17, R.R. at 192a–93a.) The day before the scheduled meeting between Mascaro and the Township, the Township's Board of Supervisors (Supervisors) held its regular bi-monthly public meeting, at which it considered the Township's waste hauling contract. (Stipulation at ¶ 18, R.R. at 193a.) At the meeting, it was suggested that advertising for a new waste hauling contract should be postponed until after the meeting with Mascaro scheduled for the next day. (Stipulation at ¶ 19, R.R. at 193a.) Additionally, the question arose whether authorizing advertising for bids would impact "the negotiations" scheduled for the next day between Mascaro and the Township. (Stipulation at ¶ 20, R.R. at 193a.) Because there was only a very short window before year-end to conduct a new bid solicitation, the authorization for advertising was considered appropriate. (Stipulation at ¶ 19, R.R. at 193a.) If the Township exercised the options under the 2005 Contract, it would cost $477.09 per year per unit, but two neighboring townships were paying less than that amount for similar trash and recycling services.[4] (Stipulation at ¶¶ 21, 22, R.R. at 193a–94a.) Given the lower rates being paid by nearby municipalities, it was recommended that the Township either try to arrange a better deal with Mascaro at less than the option prices under the 2005 Contract or solicit bids for a new contract. (Stipulation at ¶ 23, R.R. at 194a.) Thus, the Supervisors voted to authorize advertising for new bids only if the meeting planned for the following day with Mascaro did not

3. A "unit" is a household, and there are approximately 8,350 units in the Township.

4. In Lower Southampton Township the cost in 2009 was $313 per household per year and in Middletown Township the cost in 2009 was $356 per household per year. (Stipulation at ¶ 22, R.R. at 194a.)

result in an acceptable reduction in the current option price under the 2005 Contract. (Stipulation at ¶ 24, R.R. at 194a.)

At the next day's meeting on September 25, 2005, the Township and Mascaro negotiated a change in the option year prices for 2010 and 2011. Mascaro essentially agreed to freeze the 2009 prices, which reduced the cost from $477 per year per unit to $429.36 per year per household. (Stipulation at ¶ 26, R.R. at 194a.) This would be accomplished by Mascaro preparing an "amendment" to the 2005 Contract establishing a "rebate" that would reflect the proposed price reduction to $429.36, so that Township could exercise the options for years 2010–2011 in the amount of $477.09 as set forth in the 2005 Contract. (Stipulation at ¶ 27, R.R. at 195a.) In all other respects, the 2005 Contract remained the same. This arrangement, consisting of a proposed rebate, would reduce the prices for 2010–2011 by $797,592. The parties memorialized their negotiations in what was termed Amendment No. 1 (the Amendment) to the 2005 Contract.[5] (Stipulation, Ex. 15, R.R. at 304a.) At its next regularly scheduled public meeting on Oc-

tober 8, 2009, after reviewing the Amendment, the Supervisors voted to approve it. (Stipulation at ¶¶ 40–43, R.R. at 198a.)

Hanisco, an adult taxpayer residing within the Township, filed a complaint for declaratory judgment against the Township, which was later amended to add Mascaro as a defendant.[6] (Amended Complaint, R.R. at 6a–130a.) Hanisco then filed the Petition against implementation of the Amendment and to require the Township to engage in competitive bidding for a new waste services contract. (Petition, R.R. at 131a–43a.) On January 11, 2010, the trial court denied Hanisco's request for declaratory and injunctive relief. (Trial Ct. Order, January 11, 2010.) Appellant appealed.[7]

In its Pa. R.A.P.1925(a) opinion, the trial court looked at whether the Amendment to the 2005 Contract was a valid extension of the original contract. Relying on its interpretation of precedent, the trial court concluded that the Amendment did not create a new contract because the two-year extension had been contemplated in the original bidding process and the Amendment

---

5. The Amendment specifically states, in relevant part:

> WHEREAS, the Contract provides for an option of two (2) one-year extensions to be exercised exclusively by the Township, as defined under the terms of the March 24, 2005 Contract between [Mascaro] and Township; and
> WHEREAS, the Township desires to exercise the two one-year options; and
> WHEREAS, [Mascaro] in consideration for the Township's exercising of the two one-year options desires to provide the Township with a rebate;
> NOW, THEREFORE, the parties hereby agree to the Amendment as follows:
> 1. The option years 2010 and 2011 are hereby exercised by the Township.
> 2. Although the option year pricing in the Contract provides for a monthly per unit price of $39.76 in 2010 and 2011,

> [Mascaro] agrees to rebate the sum of $3.98 per unit per month thereby setting the monthly per unit price at $35.78.
> 3. The rebate of $797,592 ($3.98 per unit × 8350 units × 24 months) is offered and provided solely at the discretion of [Mascaro].

(Stipulation, Ex. 15, R.R. 304a.)

6. "[A] taxpayer has standing to enjoin the award of a public contract to anyone other than the lowest responsible bidder. . . . [H]aving an interest in public funds, [a taxpayer] may maintain an action aimed at preventing an unauthorized or unlawful expenditure of money." *The Conduit and Foundation Corp. v. City of Philadelphia*, 41 Pa.Cmwlth. 641, 401 A.2d 376, 378 (1979).

7. Hanisco also filed a motion for post-trial relief, which the trial court denied. (Trial Ct. Order, March 29, 2010.)

did not affect the scope or type of services being provided. The trial court approved the rebate, noting that it did not make "common sense" to force the Township to stick to the original bid prices for 2010–2011. The trial court believed that prohibiting the rebate would satisfy Hanisco's view of what the law requires, but it would force Township residents to pay more. The matter is now before this Court for our consideration.[8]

On appeal, Hanisco argues that the privately negotiated price term in the form of a "rebate" created a new contract that was subject to the competitive bidding requirements of Section 68102(a) of the Code.[9] 53 P.S. § 68102(a). Hanisco contends that the options, the terms of which were set forth in the 2005 Contract, were not exercised in accordance with their original terms by the Township, and that the private negotiations between Mascaro and the Township changed those terms thereby creating a new contract. Hanisco further contends that Mascaro received an advantage over other waste haulers through the private negotiations, which changed the original contract option price, reducing that price so that Mascaro was retained as the Township's waste hauler.[10] Hanisco also argues, that had the Township advertised for new bids, the Township may have realized an even better price but, because there was no such bidding, it is unknown whether the negotiated price is fair. Therefore, Hanisco argues, the Amendment is illegal and void.

The Township and Mascaro respond that the Amendment is a supplement to the existing contract, not a new contract. They contend that, once a public contract has been lawfully awarded in accordance with competitive bidding to the lowest responsible bidder, a lower price may be negotiated[11] and there is no restriction in

8. This case involves a question of law; thus, our scope of review is plenary and the standard of review is *de novo*. *Crandell v. Pennsbury Township Board of Supervisors*, 985 A.2d 288, 293 n. 4 (Pa.Cmwlth.2009). The trial court also denied Hanisco's request for a preliminary injunction. However, because the trial court's order dismissed the entire matter, review of the denial of the preliminary injunction is unnecessary.

9. We have consolidated Hanisco's four arguments.

10. Hanisco asserts that, in addition to the price change, the parties also modified other aspects of the 2005 Contract by exercising both option years at once, modifying bond provisions, and shifting the discretion to Mascaro to continue for two more years. However, it appears that the Amendment changed only the price of the original option agreement to the 2005 Contract.

11. The Township points to the COSTARS program, created by the Department of General Services, as an example of where a government agency may award contracts to suppliers through competitive bidding and are then free to negotiate even lower prices with those suppliers. However, the Supreme Court recently affirmed this Court's enjoining of the Department of Transportation's contracting for services through innovative methods beyond the provisions of applicable statutory bidding requirements and stated:

> Indeed, the court's evaluation was expressed against a backdrop of case law explaining that competitive bidding rules exist, not only to secure work and supplies at the lowest possible price, but to guard against favoritism in the awarding of contracts. See *Brayman* [*Construction Corp. v. Department of Transportation (Brayman I)*], No. 527 M.D. 2008, slip op. at 9 n. 7 [ (Pa.Cmwlth. Feb. 17, 2009) ] (quoting *Yohe v. City of Lower Burrell*, 418 Pa. 23, 28, 208 A.2d 847, 850 (1965)); see also *Louchheim v. City of Philadelphia*, 218 Pa. 100, 103, 66 A. 1121, 1122 (1907). Accordingly, to the extent any question remains as to the propriety of this part of the order, we find that it is supported by the hearing testimony concerning the lack of objective standards in best-value assessment, and the consequent potential for subjective factors to play a substantial role in the awarding of contracts.

the Code to prevent the Township from accepting a rebate. They note that the options to extend the 2005 Contract were specified in the original bid solicitation and were a term of the 2005 Contract. They further argue that amendments that are not substantial and are favorable to the taxpayers, such as the Amendment here, are matters committed to the discretion of the contracting authority, and neither Hanisco nor this Court may substitute its judgment for that of the Township's elected governing body.

 The issue before this Court is whether the prices for the waste services provided by Mascaro set forth in the 2005 Contract for the two, one-year options for 2010 and 2011 could be privately renegotiated by the parties or whether such a renegotiation required public, competitive bidding pursuant to Section 3102(a) of the Code. Section 3101 [12] gives a township board of supervisors the power to "make contracts for purchases under this act and the laws of this Commonwealth." 53 P.S. § 68101. Section 3102 of the Code identifies the contracts that must be awarded through the competitive bidding process, stating in relevant part:

All contracts or purchases in excess of the required advertising amount of ten thousand dollars ($10,000), except those specifically excluded, shall not be made

except with and from *the lowest responsible bidder* after due notice in one newspaper of general circulation in the township.

53 P.S. § 68102(a) (emphasis added). The parties agree that the 2005 Contract at issue here was not a type specifically excluded from the requirement of competitive bidding. (Amended Complaint and Answer at ¶¶ 1–5, R.R. at 9a, 157a–59a.) In interpreting the competitive bidding requirements for public contracts within Section 3102(a), our Supreme Court has stated:

[T]he statutory requirements for competitive bidding, and the ordinances enacted thereunder, do not exist solely to secure work or supplies at the lowest possible price, but also have the " 'purpose of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption in the awarding of municipal contracts ... and are enacted ... not for the benefits or enrichment of bidders.' "

*Conduit and Foundation Corporation v. City of Philadelphia*, 41 Pa.Cmwlth. 641, 401 A.2d 376, 379 (1979) (adopting 10 McQuillan, Municipal Corporations § 29.29 (3rd ed.1950)). The Supreme Court has consistently expressed the value of competitive bidding as follows:

---

*Brayman Construction Corp. v. Department of Transportation (Brayman II)*, 608 Pa. 584, 606 n. 14, 13 A.3d 925, 938 n. 14 (2011). In addition, the Supreme Court noted, "as did the Commonwealth Court, that the general rule for procurement under the Code is that, '[u]nless otherwise authorized by law, all Commonwealth agency contracts shall be awarded by competitive sealed bidding.' 62 Pa. C.S. § 511." *Id.* at 606, 13 A.3d at 938. On remand, this Court reiterated that: [b]ecause the Best–Value method of awarding contracts violates all of those precepts, the use of that method is illegal under the Procurement Code and justifies the grant of a preliminary injunction. *American Totali-*

*sator Co., Inc. v. Seligman*, 489 Pa. 568, 575, 414 A.2d 1037, 1040–41 (1980). ("A court may enjoin the award of a public contract when irregularities are shown in the bidding process.") *Brayman I*, (No. 527 M.D. 2008, filed February 17, 2009, at 17–18.)
*Brayman Construction Corp. v. Department of Transportation*, 30 A.3d 560, 567 (Pa.Cmwlth. 2011).

12. Section 3101 of the Code was added by Section 1 of the Act of November 9, 1995, P.L. 350.

The obvious intent of the applicable statute is thus also to " 'close, as far as possible, every avenue to favoritism and fraud in its varied forms.' " *Louchheim v. Philadelphia,* 218 Pa. 100, 66 A. 1121 (1907) (quoting *Mazet v. City of Pittsburgh,* 137 Pa. 548, 20 A. 693 (1890)). Therefore, as ... *Louchheim* ... illustrates, the courts will not condone a situation that reveals a clear potential to become a means of favoritism, regardless of the fact that the ... officials may have acted in good faith in the particular case, which we do not doubt here.

*Conduit,* 401 A.2d at 379. Those who bid for a public contract must be "on an equal footing" and enjoy the same opportunity for open and fair competition. *Philadelphia Warehousing and Cold Storage v. Hallowell,* 88 Pa.Cmwlth. 574, 490 A.2d 955, 957 (1985). Where the bid process fails to place bidders on equal footing, the resulting contract will be declared void. The Supreme Court has noted that the "mere convenience of performance cannot be considered in the award of municipal contracts." *Pearlman v. City of Pittsburgh,* 304 Pa. 24, 30, 155 A. 118, 120 (1931). For these reasons, the Code is "intended to prevent the circumvention of bidding requirements in a manner which would permit or encourage such evasion." *Yohe v. City of Lower Burrell,* 418 Pa. 23, 28, 208 A.2d 847, 849 (1965).

Bidding requirements 'are for the purpose of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption in the awarding of municipal contracts, and to secure the best work or supplies at the lowest price practicable, and are enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public inter-

est.' (Footnotes omitted.) 10 McQuillan, Municipal Corporations § 29.19, at 266–67 (3d ed.1950).

*Id.* at 28, 208 A.2d at 850. "The statutory mandate of competitive bidding is grounded in sound public policy." *Philips Brothers Electrical Contractors, Inc. v. Pennsylvania Turnpike Commission,* 960 A.2d 941, 945 (Pa.Cmwlth.2008). "[I]t is the taxpaying citizen who provides the necessary funds and whose interest must be protected." *Yohe,* 418 Pa. at 29, 208 A.2d at 850. Moreover, "[e]ven if the purpose of an award is to benefit the public ..., private negotiations between the party awarding the contract and a successful bidder through which the terms and conditions of the competitive bids are modified or changed, are not in keeping with the purpose of competitive bidding." *Philadelphia Warehousing,* 490 A.2d at 957.

■ In *Louchheim,* our Supreme Court voided a contract awarded after private negotiations. *Id.* at 102, 66 A. at 1121. Louchheim had submitted the lowest bid. *Id.* The city then contacted a competing bidder, which modified its bid to make it lower than Louchheim's bid and won the contract. *Id.* at 102, 66 A. at 1122. Our Supreme Court voided the contract, holding that private negotiations cannot be used to manipulate the outcome of competitive bidding. *Id.* at 104, 66 A. at 1122. The bidding process is intended to achieve 'fair and just competition between bidders, and at the same time close, as far as possible, every avenue to favoritism and fraud in its varied forms.' *Id.* at 103, 66 A. at 1122 (quoting *Mazet v. City of Pittsburgh,* 137 Pa. 548, 561–62, 20 A. 693, 697 (1890)).

■ A deviation from competitive bidding will not be countenanced even where there is no evidence of fraud or favoritism. In *Shaeffer v. City of Lancaster,* 754 A.2d

719 (Pa.Cmwlth. 2000), the city invited bids for a construction project that specified all terms, including the reservation of certain salvage rights in the city. The city awarded the contract to the lowest bidder, whose bid was lowest by reason of its proposed price "credit" whereby the city waived its salvage right. Because there was no evidence of favoritism, fraud, or unfair advantage, the trial court refused to void the contract. It found that the successful bidder had simply been more resourceful in fashioning its bid. This Court reversed, holding that the successful bidder's deviation from the city's bid requirements was unfair. We reiterated that "all bidders must ... be given the same fair opportunity to bid in free competition with each other." *Id.* at 723. Moreover, citing *Louchheim* and *Yohe,* our Supreme Court recently re-emphasized that " 'competitive bidding rules exist, not only to secure work and supplies at the lowest possible price, but to guard against favoritism in the awarding of contracts.' " *Brayman Construction Corp. v. Department of Transportation,* (*Brayman II* ) 608 Pa. 584, 606 n. 14, 13 A.3d 925, 938 n. 14 (2011) (quoting *Brayman I* ).

All parties argue that *On–Point Technology Systems, Inc. v. Department of Revenue,* 569 Pa. 236, 803 A.2d 1175 (2002), and *Bevilacqua v. Clark,* 377 Pa. 1, 103 A.2d 661 (1954), compel a ruling in their favor. *Bevilacqua* involved a license agreement to operate a golf driving range concession in a city park. *Id.* at 2, 103 A.2d at 662. The original contract provided for an extension of additional yearly terms not to exceed four years upon the approval of permanent improvements to be made by licensee at his own expense.[13] *Id.* at 3, 103 A.2d at 662. The city executed an extension agreement in accordance with the original contract provision, which extended the concession license for two additional years at the same rental rate. *Id.* at 3–4, 103 A.2d at 662–63. Bevilacqua was an unsuccessful bidder and taxpayer who challenged this extension. Bevilacqua argued that the clause in the original license contract, providing for the extension did not adequately define the standards under which the contract could be extended. *Id.* at 2, 4, 103 A.2d at 662–63. The Supreme Court disagreed, finding the standards "sufficiently definite to permit all who bid thereon to know under what conditions the license would be lengthened." *Id.* at 5, 103 A.2d at 663–64. Furthermore, the Supreme Court expressly stated that "[t]he only term open to negotiation [wa]s the period of extension, and even then there is a four year limitation. There could be no negotiation on the *amount* of the rental." *Id.* at 5–6, 103 A.2d at 663–64 (emphasis in the original). Like the contract in *Bevilacqua,* the option provisions in the 2005 Contract specified the price; however, in this case, the parties to the 2005 Contract

**13.** The proposal, and the license, contained the following clause:

> Where licensee considers that it is desirable or necessary to make permanent improvements to the concession structure, he shall submit a proposal to the Commission with a plan of the improvements and a statement of the actual cost thereof. If the Commission approves the construction of such permanent improvements, it will negotiate a supplemental agreement with licensee, providing that the license shall be extended for additional yearly terms not to exceed four

years, depending upon the nature and cost of the improvements; and further providing that, if the Commission should elect to terminate the license within such extended period, it will pay to licensee such proportion of the actual cost of such improvements as the unexpired term bears to the total term of the license. In the event the license remains in effect for the full term agreed upon, no payment shall be due licensee. *Bevilacqua,* 377 Pa. at 3, 103 A.2d at 662.

did attempt to renegotiate the "amount." Thus, *Bevilacqua* does not support the Township's and Mascara's position.

In *On–Point Technology,* the Department of Revenue (Department), on behalf of the Pennsylvania Lottery, requested bids for an online games system. The bid request contained an "options" section, noting that bidders could also submit bids for lottery ticket vending machines, although such information would not be considered in awarding the online games contract. The online gaming system contract awarded to Automated Wagering stated that, if the Department chose to exercise an "option," the price and terms would be "mutually agreed upon by the parties." *On–Point Technology,* 569 Pa. at 238, 803 A.2d at 1177. Thereafter, the parties executed a contract amendment whereby Automated Wagering agreed to furnish 2,400 ticket vending machines to the Department at a cost of $225 per machine, per month. In holding that the option contract was an invalid amendment to the original contract, the Supreme Court reasoned that

> because the original contract failed to contain any essential terms regarding the future acquisition of instant ticket vending machines, *the … amendment was not an extension of the work contemplated by the original agreement but instead was a new contract. …*

*Id.* at 243, 803 A.2d at 1180 (emphasis added). The Supreme Court further concluded that the amendment not only was an invalid extension of the original contract, but also constituted a new contract subject to competitive bidding. *Id.* The Court distinguished *Bevilacqua,* noting that the license agreement therein had been competitively bid, the extension of the concession license had been contemplated in that bidding, and the terms of any extension had all been spelled out in the original contract. *Id.* at 241–43, 803 A.2d at 1179–80. By contrast, the vending machines option in *On–Point Technology* had not been part of the competitive bidding or considered in the award of the contract. *Id.* at 243, 803 A.2d at 1180. The contract did not obligate the Department to acquire any vending machines, and *it contained no terms for their purchase. Id.*

▉▉▉▉ Unlike the option in *On–Point Technology,* the option in the instant case contained the essential terms, including price, and was a part of the competitive bidding process. This price term was definite and not open for future negotiation. Indeed, the option here was even more definite than that in *Bevilacqua,* where the term of the option remained open for negotiation based on the value of the improvements the concessionaire made. Here, because the Township did not exercise the option in accordance with its terms but, instead negotiated a new price,[14] the Town-

---

14. The dissent argues that amendments to public contracts can be made as long as they do not constitute a new undertaking, citing *Commonwealth ex rel. Met–Con Co. v. Jones,* 283 Pa. 582, 586, 129 A. 635, 636 (1925). *Hanisco v. Township of Warminster,* 41 A.3d 116, 128 (Pa.Cmwlth.2012) (Leavitt, J., dissenting). However, this concept has not been applied where the change was made to the price term of a contract that involved the same work and price originally agreed upon. Pointing to case law from Alaska and Massachusetts, the dissent seeks to adopt the mate- rial amendments doctrine for Pennsylvania, which would permit a contract previously awarded to be renegotiated to arrive at a more favorable term if that term is not a material amendment to the contract. The Township and Mascaro, however, do not raise this issue or assert this defense in their briefs and, therefore, it is waived. Pa. R.A.P. 2116(a), 2119(a), (e); *Oliver v. Unemployment Compensation Board of Review,* 5 A.3d 432, 440 (Pa.Cmwlth.2010). We decline to develop an issue that was waived, particularly where the renegotiation of price was not con-

ship and Mascaro entered into a new contract that became subject to the Code's mandatory public bidding requirements.[15]

Where, as here, there is deviation from the requirements of public bidding, "the proper procedure is to ... readvertise, and secure another open competitive bidding so that all of the bidders would be on an equal footing."[16] *Philadelphia Warehousing*, 490 A.2d at 957. This Court has emphasized that it "will not condone a situation that reveals a clear potential to become a means of favoritism, regardless of the fact that ... officials may have acted in good faith in the particular case." *Conduit*, 401 A.2d at 379. The overarching public policy encompassed by the public bidding requirements must take precedence to ensure the integrity of the process, its transparency and fairness, and to engender a greater sense of trust in government among the citizen taxpayers. While we understand that the Township wanted to provide savings to its constituents, the decision not to advertise its waste services contract for competitive bidding has prevented the parties from knowing whether greater savings could have been achieved had the contract been rebid pursuant to the Code.

Accordingly, we reverse the trial court's Order.

Judge McCULLOUGH did not participate in the decision in this case.

### ORDER

**NOW,** January 5, 2012, the order of the Court of Common Pleas of Bucks County in the above-captioned case, dated January 11, 2010, is hereby REVERSED.

### DISSENTING OPINION BY Judge LEAVITT.

Respectfully, I dissent. The two-year extension of the waste services contract between the Township of Warminster (Township) and Solid Waste Services, Inc. d/b/a J.P. Mascaro & Sons (Mascaro) did not trigger another round of competitive bidding requirements when the contractor, the low bidder, agreed to further reduce its low-bid price during the extension period. This is because, as the trial court

templated by the original contract and, pursuant to *Bevilacqua*, 377 Pa. at 5–6, 103 A.2d at 663–64, "there could be no negotiation on the amount."

15. The law of contracts further supports Hanisco's position. An option is a contract to keep an offer open. *Warner Brothers Theatres v. Proffitt*, 329 Pa. 316, 319, 198 A. 56, 57 (1938); Restatement (First) of Contracts (1932), § 24; 1 Williston on Contracts, 1920, § 61. The acceptance of an offer, to be effective, must be unconditional. *Jaxtheimer v. Sharpsville Borough*, 238 Pa. 42, 57, 85 A. 994, 999 (1913). An option presents no exception to this rule because "[a]n option is a unilateral agreement binding upon the party who executes it from the date of its execution and becomes a contract *inter partes* when exercised according to its terms." *Boyer v. Nesbitt*, 227 Pa. 398, 405, 76 A. 103, 105 (1910) (emphasis added). Thus, "[a]n option

is an unaccepted offer ... upon the conditions set forth in the written agreement." *Barnes v. Rea*, 219 Pa. 279, 284, 68 A. 836, 838 (1908). The price term for the options as set forth in the 2005 Contract are material terms of the contract. *See Stevens v. Doylestown Building & Loan Association*, 321 Pa. 173, 174, 183 A. 922, 923 (1936) (noting that price is a material term of a contract).

16. We disagree with the Township's argument that failure to renegotiate the options would have resulted in the Township's payment of the higher prices set out in the original option contracts. The Supervisors had already voted to authorize the advertising of a new waste services contract if the private negotiations with Mascaro did not result in a reduction of the option price under the 2005 Contract; thus, they had determined not to exercise those options or to pay the higher prices. (Joint Stipulation at ¶¶ 23–24, R.R. at 194a.)

concluded, the extension was a term addressed in the original bidding procedure. Further, because the amendment did not affect the scope or type of services being provided, the trial court held that the amendment did not effect a new contract. Because the trial court's reasoning is consistent with case law precedent, I would affirm.

The facts of this case are undisputed. As the lowest responsible bidder, Mascaro was awarded a five-year waste services contract by the Township with the option of a two-year extension for 2010 and 2011. After five years, the Township and Mascaro executed Amendment No. 1, which extended the contract for two more years but froze the contract prices at their 2009 level. Because all bidders to the original contract were put on notice that there could be a two-year extension and because the agreement to freeze prices was not a material amendment, the trial court refused to grant Hanisco relief.

To reach the opposite conclusion, the majority relies upon *Louchheim v. City of Philadelphia*, 218 Pa. 100, 66 A. 1121 (1907), and *Shaeffer v. City of Lancaster*, 754 A.2d 719 (Pa.Cmwlth.2000). These cases begin with the well-established principle that "all bidders must . . . be given the same fair opportunity to bid in free competition with each other." *Shaeffer*, 754 A.2d at 723. Competitive bidding effects a "fair and just competition between bidders, and at the same time [closes], as far as possible, every avenue to favoritism and fraud in its varied forms." *Louchheim*, 218 Pa. at 103, 66 A. at 1122 (quoting *Mazet v. City of Pittsburgh*, 137 Pa. 548, 20 A. 693 (1890)). The trial court's holding is not inconsistent with these sound and well-established principles.

*Louchheim* and *Shaeffer* each involved private negotiations that were done *prior* to the award of a contract. Here, by contrast, Mascaro was awarded the waste services contract *after* it was competitively bid. *Louchheim* and *Shaeffer* do not address the crucial question presented here, which is to what extent, if any, the parties to a competitively bid contract may amend its terms after the contract is properly awarded.

On this question, two rulings of our Supreme Court are instructive. The first is *Bevilacqua v. Clark*, 377 Pa. 1, 103 A.2d 661 (1954), and the second is *On–Point Technology Systems, Inc. v. Department of Revenue*, 569 Pa. 236, 803 A.2d 1175 (2002).

In *Bevilacqua*, a licensee of a concession at a golf course owned by the City of Philadelphia made permanent improvements to the concession stand at his own expense; in return the City agreed to extend the concession contract for two additional years without a rent increase. A taxpayer challenged the extension as violative of competitive bidding requirements because the terms of the extension were negotiated by the parties. Our Supreme Court disagreed. It held that the terms of the contract extension could be negotiated *after* the contract was awarded because the possibility of an extension was expressed in the bid proposal and because the contract itself limited the term of any negotiated extension to four years. The Supreme Court could have held that any post-award negotiations violated competitive bidding, but it did not. The Court approved the parties' negotiated contract extension terms, which included price. The lessee's negotiated rent increase took the form of the lessee's building improvements.[1]

---

1. The Supreme Court noted that the rental amount did not change. In fact, by having

his lease extended two years without a rent

In *On–Point Technology,* the Department of Revenue, on behalf of the Pennsylvania Lottery, requested bids and awarded a contract for an online games system to the lowest bidder. The parties then negotiated a separate contract for the use of vending machines to sell lottery tickets. The Supreme Court held that the new contract was not a valid amendment to the first contract because use of vending machines was excluded from consideration in the original contract award.

Contrary to the majority's suggestion, *Bevilacqua* and *On–Point Technology* do not stand for the proposition that a competitively bid contract price cannot be amended. The general principle is that so long as amendments to competitively bid contracts do not effect a new undertaking, they are permitted. 64 C.J.S., *Municipal Corporations* § 918 (Westlaw 2011). Only material amendments to a competitively bid contract may effect a new contract that requires a new round of competitive bidding. 64 Am.Jur.2d *Public Works and Contracts* § 120 (LEXIS 2010).[2]

The Pennsylvania Supreme Court has expressly acknowledged that amendments to public contracts can be made, so long as they do not constitute a "new undertaking." It has explained:

> True, municipal authorities may, without advertising for bids, provide for work incidental to that covered by the original contract, or for such minor changes and additions thereto as may become reasonably necessary, but cannot so authorize what amounts to a new undertaking.

*Commonwealth ex rel. Met–Con Co. v. Jones,* 283 Pa. 582, 586, 129 A. 635, 636 (1925) (citation omitted). The Court continued:

> These officers [municipal officers] must act honestly, reasonably and intelligently, and a new departure must not so vary from the original plan or be of such importance as to constitute a new undertaking, which the act controls, and where fairness could only be reached through competitive bidding.

*Id.* (quoting *Hibbs v. Arensberg,* 276 Pa. 24, 27, 119 A. 727, 728 (1923)).

However, in *Jones,* the Supreme Court recognized there is a limit to valid contract amendments. There, the contract in question contemplated the construction of highway guardrails and retaining walls and, thus, could not be amended to include excavation to eliminate dangerous curves in the highway. The Supreme Court reasoned that such excavation work was "entirely outside the original contract" such that the "bidders at that time . . . could have had no knowledge of it." *Jones,* 283 Pa. at 585–586, 129 A. at 636. Stated otherwise, the Supreme Court employed the material amendments doctrine in *Jones* and concluded that the amendments in question were material, *i.e.,* effected a

---

increase, the lessee paid a different, and negotiated, rent for the concession.

2. Specifically, it states:
> In general, under the "material amendments doctrine," competitively bid contracts involving state resources cannot be materially amended. So, for example, by seeking to modify its original bid and negotiate a more favorable agreement for itself, after it has already secured a public works contract as the low bidder, a contractor is,

in effect, improperly attempting to secure an unfair competitive advantage over the other legitimate bidders and to conduct a type of post bid negotiations that violate the practice of competitive bidding.

64 Am.Jur.2d *Public Works and Contracts* § 120 (LEXIS 2010). Thus, an attempt by a contractor to negotiate higher prices, after it has been awarded the public contract for its low bid, would violate the material amendments doctrine.

new undertaking.[3]

The Massachusetts Supreme Court's holding in *Morse v. City of Boston*, 253 Mass. 247, 148 N.E. 813 (1925), is instructive on the material amendments doctrine. In *Morse*, the City of Boston awarded a competitively bid contract "to fill certain land with earth and gravel and loam, with other improvements." 253 Mass. at 249, 148 N.E. at 814. After the project began, the contract was amended to require the delivery of so much additional earth and gravel that it increased the cost of the contract by one-third. The Massachusetts Supreme Court held that these amendments effected a new contract, explaining that

> *[t]he alterations permissible under [the material amendments doctrine] are such in nature, magnitude and expense as bear a reasonable subsidiary relation to the work originally covered by the contract.* When a contract is to be modified so as in substance and effect to be made new and different in main aspects, that cannot be done under the guise of an amendment or alteration.

3. The Supreme Court of Alaska has provided a helpful explanation of the concept of material amendments as follows:

> Not all amendments to competitively bid contracts are prohibited, only those regarded as material. The concept of materiality in this context has not been satisfactorily captured in a single phrase. One court has spoken of "an essential change of such magnitude as to be incompatible with the general scheme" of competitive bidding; another has phrased the question to be whether the amendment "so varied from the original plan, was of such importance, or so altered the essential identity or main purpose of the contract, that it constitutes a new undertaking." *These formulations simply recognize that the materiality concept prohibits those changes which tend to be subversive to the purposes of competitive bidding.*

*Id.* at 253, 148 N.E. at 815–816 (emphasis added). In short, where an amendment increases the contract cost by one-third, the parties have effected a new undertaking that requires competitive bidding.

Under the above-reviewed authority, a competitively bid contract can be amended so long as the changes are not so substantial that they result in a "new undertaking" and are not of such magnitude that they undermine the goals of competitive bidding. In *Jones*, 283 Pa. 582, 129 A. 635, the Pennsylvania Supreme Court employed the material amendments doctrine analysis, and this analysis would not have been undertaken if the doctrine were not viable in Pennsylvania. Indeed, our Supreme Court has had many opportunities to announce that public contracts cannot be amended, most recently in *On–Point Technology*, but it has not done so. The majority does not even mention the material amendments doctrine.[4] It has never been held, so far as can be determined, that *after* a contract price has been set by competitive bidding, it cannot be further reduced.

*Kenai Lumber Company, Inc. v. LeResche*, 646 P.2d 215, 221 (Alaska 1982) (emphasis added) (footnotes omitted).

4. The majority incorrectly states that a contract option cannot be modified. A contract option keeps open the possibility of future performance and "limits the promisor's power to revoke an offer." RESTATEMENT (SECOND) OF CONTRACTS § 25. An option is

> nothing more than an irrevocable offer, which, for the time agreed upon, cannot be unilaterally withdrawn, revoked, or rescinded by the offeror, and may only be *modified,* released, or rescinded *by agreement of the parties.*

17A Am.Jur.2d *Contracts* § 53 (LEXIS 2011) (emphasis added). Applying these principles here means only that Mascaro could not refuse to honor its option prices for 2010–2011. Parties can, however, by mutual agreement, modify option terms, and they did so here.

In 2005, Mascaro presented a bid in accordance with the Township's bid specifications. It was the lowest responsible, indeed only, bidder. The two-year extension of the contract was expressly included in the bid request, and all potential bidders were on notice of the possible extension. Hanisco does not dispute these points. He also acknowledges that the Township could have exercised its contractual extension option by paying the 2010–2011 prices stated in the contract, which were higher than the 2009 levels set in Amendment No. 1. Hanisco objects to the extension solely because the parties mutually agreed to reduce the low-bid prices even further.

The subject matter of the contract, the scope of services and frequency of collection provided by Mascaro remained exactly the same. The extension itself was contemplated in the original contract. The more favorable prices in Amendment No. 1 did not represent a "material" change or effect a "new undertaking." The total bid price for the entire five-year contract plus the two option years was $23,326,104, and Amendment No. 1 reduced the total price to the Township by $797,592, which is 3.4 percent of the total contract price. This amount does not constitute a material change, and given the short duration of two years, falls within the holding in *Bevilacqua*.[5]

The majority points out that there is no way of knowing if the Township might have realized greater monetary savings by rebidding the contract rather than executing the amendment. The Township considered a rebid but concluded that given the high degree of satisfaction among Township residents with the service being received and the fact that the pricing trends were moving upwards, it made better sense to stay put.[6] All agree that the Township could have stayed put for two more years simply by paying an additional $800,000. Courts do not inquire into the wisdom of a municipality's action.

> That a court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; *judicial discretion may not be substituted for administrative discretion.*

*American Totalisator Company, Inc. v. Seligman*, 489 Pa. 568, 575, 414 A.2d 1037, 1041 (1980) (quoting *Blumenschein v. Pittsburgh Housing Authority*, 379 Pa. 566, 573, 109 A.2d 331, 335 (1954)) (emphasis added).

The trial court concluded that it was absurd to allow the Township the discretion to extend the contract for two years at the original low bid price but deny it the discretion to negotiate an even lower price. The majority's holding will require rigid adherence to a contract's price terms and has the value of creating a predictable rule for public contracting. It does so, however, by depriving the government of any

---

5. There does not appear to be any prior holding in Pennsylvania that a contract price is the one term to which the material amendments doctrine cannot be applied. Perhaps it would be wise to forbid parties to an in-force public contract from ever reducing the contract price, but that does not appear to be the law today. As such, there is nothing to preclude a holding that the reduction of the low bidder's price, after the contract has been awarded, is not a material change.

6. The Township's research showed that nearby municipalities receiving the same number of pickups as the Township had seen their prices increase from 1.5 percent to 16 percent per year, with the average increase being 5 percent. The Township Solicitor reported that the highest price paid by five neighboring townships was $341.76 per household, per year. However, the Solicitor pointed out that this was not an "apples to apples" comparison because none of the other five townships had the same frequency of pickups or the same range of pick up services.

discretion to achieve an even better price for taxpayers *after* the prices have been set by competitive bidding. This elimination of discretion seems more than is necessary to preserve competitive bidding.

I would affirm the trial court's decision to allow the Township discretion to reduce the already low-bid contract price even further, for a limited period of time.